## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| CITY OF ST. LOUIS,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC.,<br><br>Defendants. | MDL NO.: 2873<br><br>Master Docket No.: 2:18-mn-2873-RMG<br><br>JUDGE RICHARD GERGEL<br><br>Civil Case No.:   2:23-cv-02209-RMG<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, City of St. Louis ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), Kidde PLC, Inc., Chubb Fire,

Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), Nation Ford Chemical Company, National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## I.    SUMMARY OF THE CASE

1.      Plaintiff brings this action against Defendants to recover any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property (as defined below), operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

2.      Plaintiff, City of St. Louis, is a body corporate and politic created pursuant to the laws of the State of Missouri.

3.      Plaintiff is the owner and operator of various lands, properties, facilities, infrastructures, equipment, and resources including, but not limited to, the St. Louis Lambert International Airport (collectively, "Plaintiff's Property").

4.      St. Louis Lambert International Airport is a FAA Part 139 airport and home to the Lambert Air National Guard Base.

5.      Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), have been detected in portions of Plaintiff's Property.

6.      PFOA and PFOS are man-made compounds that are harmful, persistent in the environment, and do not biodegrade.

7.      At various times from the 1960s through today, Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of PFOS, PFOA, the chemical precursors of PFOS and/or PFOA, and/or products containing PFOS, PFOA, and/or their chemical precursors.[1]

8.      Defendants' Fluorosurfactant Products are used in and/or include, but are not limited to, Teflon®, Scotchgard®, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, aqueous film-forming foam ("AFFF"), and various other products.

9.      AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

10.      Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these compounds would be released into the environment even when released, stored, used, cleaned up, and/or disposed of as directed or intended by Defendants.

11.      Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, stored, used, cleaned up, and/or disposed of at or on Plaintiff's Property, including the St. Louis Lambert International Airport. During these activities, Defendants' Fluorosurfactant Products were released, stored, used, cleaned up, and/or disposed of

---

[1] In this Complaint, "Fluorosurfactant Products" collectively refers to PFOS, PFOA, the chemical precursors of PFOS and/or PFOA, and/or products containing PFOS, PFOA, and/or their chemical precursors.

as directed and intended by the Defendants, which allowed PFAS to enter the environment, soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property. As a result, PFAS have been detected in Plaintiff's Property, thereby contaminating Plaintiff's Property and causing damage to Plaintiff.

12.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

13.     At all times pertinent herein, Plaintiff did not know, nor should Plaintiff have known, of the ongoing contamination of its Property through the use, release, storage, clean up, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the harmful nature and effects of their Fluorosurfactant Products.

14.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, filter, dispose of, treat, and monitor the PFAS contamination of Plaintiff's Property caused by the use, release, storage, clean up, and/or disposal of Defendants' Fluorosurfactant Products at Plaintiff's Property, as well as any and all other damages recoverable under applicable state and/or federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as reasonable attorneys' fees and costs.

## II.     PARTIES

15.     Plaintiff, City of St. Louis, is a body corporate and politic established under and pursuant to the laws of the State of Missouri. Plaintiff's principal address is 1200 Market Street, St. Louis, MO 63103.

16.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

1) Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation with its principal place of business located at 3M Center, St. Paul, MN 55144. 3M conducted business throughout the United States, including Missouri. Upon information and belief, 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including Missouri.

2) Defendant E. I. DuPont De Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, DE 19805. Upon information and belief, Old DuPont does and/or has done business throughout the United States, including Missouri.

3) Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, DE 19899. Chemours is registered to do business in the State of Missouri.

4) In 2015, Old DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

5) Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, DE, 19899. Chemours FC is registered to do business in Missouri.

6) Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, DE 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Old DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). New DuPont is believed to have assumed some of the PFAS liabilities of Old DuPont. Upon information and belief, New DuPont does and/or has done business throughout the United States, including Missouri.

7) Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, DE 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of Old DuPont. Corteva, Inc. is registered to do business in Missouri.

8) Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, WI 54143. Upon information and belief, Chemguard conducts and/or avails itself of doing business throughout the United States, including Missouri. Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC").

Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in Missouri.

9) Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business at 1400 Pennbrook Parkway, Lansdale, PA 19446. Tyco acquired Chemguard in 2011. Tyco is registered to do business in Missouri.

10) Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief, Tyco/Ansul conducts and/or avails itself of doing business throughout the United States, including Missouri.

11) Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, CT 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. conducts and/or avails itself of doing business throughout the United States, including Missouri.

12) Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

13) Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach

Gardens, FL 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in Missouri.

14) Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. Upon information and belief, Carrier Global Corporation conducts and/or avails itself of doing business throughout the United States, including Missouri.

15) Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 1000 Wilson Blvd, Arlington, VA, 22209. Raytheon is registered to do business in Missouri.

16) Defendant National Foam, Inc. is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, NC 27501. National Foam, Inc. is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam, Inc. manufactures the Angus brand of AFFF products. Upon information and belief, National Foam, Inc. conducts and/or avails itself of doing business throughout the United States, including Missouri.

17) Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, NC 28086. Upon information and belief, Buckeye conducts and/or avails itself of doing business throughout the United States, including Missouri.

18) Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, PA 19406. Arkema, Inc. is registered to do business in Missouri.

19) Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, NJ 07932. BASF is registered to do business in Missouri. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals conducts and/or avails itself of doing business throughout the United States, including Missouri.

20) Defendant ChemDesign Products, Inc. ("CDPI") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, WI 54143. Upon information and belief, CDPI conducts and/or avails itself of doing business throughout the United States, including Missouri.

21) Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, NC 28205. Clariant Corporation is registered to do business in Missouri.

22) Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, TX 77521. Upon information and belief, Chemicals Incorporated conducts and/or avails itself of doing business throughout the United States, including Missouri.

23) Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, SC 29715. Upon information and belief, Nation Ford Chemical Company conducts and/or avails itself of doing business throughout the United States, including Missouri.

24) Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201,

Exton, PA 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. Upon information and belief, AGC America conducts and/or avails itself of doing business throughout the United States, including Missouri.

25) Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

26) Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business at 196122 E County Road 40, Woodward, OK 73801. Upon information and belief, Deepwater conducts and/or avails itself of doing business throughout the United States, including Missouri.

27) Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, NY 10523. In 1991, Dynax Corporation entered the market, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in AFFF. Upon information and belief, Dynax Corporation conducts and/or avails itself of doing business throughout the United States, including Missouri.

28) Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

29) Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, NC 28217.   Upon

information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Archroma U.S., Inc. is registered to do business in Missouri.

30) Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

17.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

18.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## III. JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

20.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing

in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the Eastern District of Missouri, Eastern Division. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the Eastern District of Missouri, Eastern Division, as the "Home Venue" as this case may have originally been filed there.

21.    Venue is proper in the United States District Court for the Eastern District of Missouri, Eastern Division, pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. THE CONTAMINANTS: PFOA & PFOS.

22.    PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

23.    PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. They persist in the environment and are resistant to biologic, environmental, or photochemical degradation.[2]

---

[2] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

24.    They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[3]

### B.  DEFENDANTS' FLUOROSURFACTANT PRODUCTS.

25.    PFOA, PFOS, and their chemical precursors are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the State of Missouri, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF.

26.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

27.    The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA and/or PFOS.

28.    PFOS and/or the chemical precursors to PFOS contained in 3M's Fluorosurfactant Products were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

29.    For decades, 3M manufactured, designed, marketed, distributed, and sold Fluorosurfactant Products containing PFOS, PFOA, and/or their chemical precursors within the United States, and raw materials containing PFOA and/or its chemical precursors for use in the production of Fluorosurfactant Products within the United States.

30.    All other Defendants manufactured PFAS through the process of telomerization and/or manufactured Fluorosurfactant Products containing PFAS manufactured through the process of telomerization.  Telomerization produces fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

31.    Upon information and belief, by the early 1970s, National Foam and Tyco/Ansul began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States.

---

[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

32.     Upon information and belief, by the 1980s, Chemguard began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States, and fluorosurfactants containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

33.     Upon information and belief, by the 1990s, Buckeye began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States

34.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

35.     When used as the Defendants intended and directed, Defendants' Fluorosurfactant Products release PFOA, PFOS, and/or their chemical precursors into the environment.

36.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

37.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds entered the soil and subsurface into the groundwater, thereby contaminating the soil and groundwater and causing other extensive and ongoing damage to Plaintiff's Property.

38.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

## C.  DEFENDANTS' KNOWLEDGE OF PFAS HAZARDS.

39.      On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

40.      In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[4]

41.      By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects.

42.      In 1981, Old DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, Missouri. Old DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[5]

43.      Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[6]

---

[4] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[5] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[6] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

44.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

45.     After 3M exited the AFFF market in the United States, the remaining AFFF manufacturer Defendants continued to manufacture and sell AFFF containing PFOA and/or its chemical precursors.

46.     From 1951, Old DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon® nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

47.     Based on information and belief, by no later than 2001, Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks containing or degrading into PFOA to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

48.     Old DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[7]

49.     By December 2005, the EPA uncovered evidence that Old DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[8]  The EPA fined Old DuPont for violating the Toxic

---

[7] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

[8] $16.5 million.

Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[9]

50.     By July 2011, Old DuPont could no longer credibly dispute the harmful effects of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over Old DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified Old DuPont of a "probable link"[10] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[11]    By October 2012, the C8 Science Panel had notified Old DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

51.     In July 2015, Old DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by Old DuPont. By mid-2015, Old DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

52.     Defendants knew, or reasonably should have known, at all times relevant to this action that it was substantially certain that their acts and omissions as set forth herein would cause extensive contamination of Plaintiff's Property, and otherwise cause the injuries described herein.

---

[9] U.S. Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).
[10] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.
[11] See The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

53.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFAS to contaminate the soil and groundwater at Plaintiff's Property; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of soil and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

54.    As a direct result of Defendants' acts and omissions alleged in this Complaint, Plaintiff's Property has been and will continue to be contaminated with PFAS, including PFOA and PFOS,  unless such contamination is remediated.  As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFAS contamination of Plaintiff's Property at significant expense, loss, and damage to Plaintiff.

55.    Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential environmental impacts before they sold such Products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

**D. OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES.**

56.    By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors

throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

57.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

58.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

59.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

60.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

61.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

62.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours

accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

63.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

64.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

65.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

66.     Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

67.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

68.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief,

the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

69.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

70.    Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

71.    Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

**E.  THE IMPACT OF PFAS ON PLAINTIFF AND PLAINTIFF'S PROPERTY.**

72.    PFAS, including PFOA and PFOS, have been detected in portions of Plaintiff's Property. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, in Plaintiff's Property has resulted, and will continue to result, in significant costs, injuries and damage to Plaintiff.

73.    Upon information and belief, the invasion of Plaintiff's Property with PFAS is recurring, resulting in new harm to Plaintiff on each occasion.

74.    The injuries and harm to Plaintiff caused by Defendants' conduct and Fluorosurfactant Products constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

## FIRST CAUSE OF ACTION

### PRODUCTS LIABILITY – DEFECTIVE DESIGN

75.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

76.    Plaintiff was harmed by Fluorosurfactant Products which were designed, manufactured, formulated, marketed, sold and/or distributed by Defendants, or that Defendants assumed or acquired liabilities for, and which were defectively designed, unreasonably dangerous, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

77.    Upon information and belief, Defendants' Fluorosurfactant Products used on Plaintiff's Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the Products were sold.

78.    As commercial designers, manufactures, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants have a strict duty not to place into the stream of commerce a product that is defective or unreasonably dangerous.

79.    Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA, PFOS, and/or their chemical precursors into the environment, thereby contaminating natural resources, soil, water, and property, including Plaintiff's Property.

80.    Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were harmful and do not readily degrade in the environment.

81.    PFAS contamination of the environment poses significant threats to natural resources, such as soil and groundwater, and the public welfare.

82.      Plaintiff was, is, and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

83.      The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiff.

84.      The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent, and harmful.

85.      The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were harmful and do not readily degrade in the environment.

86.      At all times relevant herein, a reasonably prudent manufacturer knew or should have known of the hazards posed by Fluorosurfactant Products.

87.      At all times relevant herein, Defendants' Fluorosurfactant Products were harmful to an extent beyond that which would be contemplated by the ordinary consumer, and the foreseeable risk of harm to the public welfare and the environment posed by Defendants' Fluorosurfactant Products outweighed the cost to Defendants of reducing or eliminating such risk.

88.      At all times relevant herein, there were safe or safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

89.      Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including  Plaintiff.  Such  conduct  was  performed  to  promote  the  sales  of  Defendants'

Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public's welfare.

90.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property, operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

## SECOND CAUSE OF ACTION

### PRODUCTS LIABILITY – FAILURE TO WARN

91.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

92.     As manufacturers, distributors, designers, formulators, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, and public officials, of the risks posed by PFOA and PFOS.

93.     Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to the environment.

94.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

95.     Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at Plaintiff's Property.

96.     Defendants' Fluorosurfactant Products were unreasonably dangerous even when used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

97.     Defendants' Fluorosurfactant Products used on Plaintiff's Property were defective in design and unreasonably dangerous for the reasons set forth herein.

98.     Despite the known and/or foreseeable environmental hazards associated with the reasonably anticipated use of Defendants' Fluorosurfactant Products atPlaintiff's Property, including contamination of Plaintiff's Property with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

99.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

100.     Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including Plaintiff. Such conduct was performed to promote the sales of Defendants' Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public welfare.

101.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property,

operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

## **THIRD CAUSE OF ACTION**

PUBLIC NUISANCE

102.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

103.    Because Plaintiff is a public entity, municipal lands and natural resources are public and commonly held resources for the benefit of its citizens. Members of the public have a right to have their lands natural resources free of Defendants' contamination.

104.    Defendants designed, manufactured, distributed, marketed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products in a manner that created, or participated in creating, a public nuisance that unreasonably and substantially interferes with the use and enjoyment of Plaintiff's Property, causing inconvenience and annoyance.

105.    Defendants' acts and omissions, including their manufacture, sale, supply, marketing and defective design of, and/or failure to warn regarding PFOS, PFOA, and/or their precursor chemicals in Defendants' Fluorosurfactant Products constitutes a hazard to public welfare and the environment.

106.    Defendants substantially interfered with and caused damage to public or common resources that interfere with municipal property and the use of said property by citizens. Such actions create, contribute to, or maintain a public nuisance.

107.    The unreasonable and substantial interference with the use and enjoyment of Plaintiff's Property includes, but is not limited to: the contamination of Plaintiff's Property with PFOS, PFOA, and/or their chemical precursors; and the exposure to known harmful chemicals manufactured and/or sold by Defendants.

108.    The presence of PFOS, PFOA, and/or their chemical precursors causes significant costs, inconvenience, and annoyance to Plaintiff, who is charged with managing and protecting public and commonly held resources for the benefit of its residents.

109.    The contamination affects a substantial number of people who rely upon Plaintiff for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe natural resources and environment.

110.    The seriousness of the environmental risk far outweighs any social utility of Defendants' conduct in manufacturing Fluorosurfactant Products and concealing the dangers those Products posed to the environment.

111.    As a result of the actual and threatened PFOA and PFOS contamination caused by Defendants' conduct, Plaintiff has suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred, and will continue to incur, substantial costs to remove the contamination from its Property.

112.    Plaintiff did not consent to the conduct that resulted in the contamination of its Property.

113.    Defendants' conduct was a substantial factor in causing the harm to Plaintiff.

114.    Defendants have, by their acts and omissions set forth above, among other things, knowingly unleashed long-lasting and ongoing PFOS and PFOA contamination, and threat of PFOS and PFOA contamination, upon Plaintiff's Property.

115.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property.

116.    Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including Plaintiff. Such conduct was performed to promote the sales of Defendants' Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public welfare.

117.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property, operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

### FOURTH CAUSE OF ACTION

PRIVATE NUISANCE

118.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

119.    Plaintiff has a property interest in its Property including, but not limited to, all lands, properties, infrastructure, and facilities owned and/or operated by Plaintiff.

120.    Portions of Plaintiff's Property has been, and continues to be, contaminated by PFOS, PFOA, and/or their chemical precursors as a direct and proximate result of the intentional, negligent, and/or reckless acts and omissions of Defendants as described herein.

121.    Defendants' manufacture, distribution, sale, supply, and/or marketing of Fluorosurfactant Products was unreasonable because Defendants had knowledge of the hazards and risks posed by PFOS, PFOA, and/or their chemical precursors, and knew that contamination

of the environment, natural resources, and property was substantially certain to occur, but failed to provide adequate warning of, or take any precautionary measures to mitigate, those hazards.

122.    Actual and threatened PFAS contamination of Plaintiff's Property caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of substantial and unreasonable interference with Plaintiff's property rights and with the ordinary use, benefit, and/or enjoyment of Plaintiff's Property.

123.    Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

124.    Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including Plaintiff. Such conduct was performed to promote the sales of Defendants' Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public welfare.

125.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property, operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

## FIFTH CAUSE OF ACTION

### TRESPASS

126.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

127.    Plaintiff is the owner and/or actual possessor of Plaintiff's Property and other relevant infrastructure associated therewith.

128.    Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS: (a) have a propensity to infiltrate and contaminate soil, sediment, surface water, and groundwater when released into the environment; (b) are mobile and persistent (c) do not readily biodegrade; (d) are harmful to the environment; and (e) are thus likely to cause ecological and economic injuries when released into the environment, such as the PFAS contamination of Plaintiff's Property and other rights.

129.    As commercial manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, and/or as those who assumed or acquired liabilities for the manufacture and sale of Fluorosurfactant Products, Defendants knew or reasonably should have known that their Fluorosurfactant Products would certainly be discharged and released into the environment resulting in the release of PFAS into the soil, sediment, and groundwater, and intrude upon, contaminate, and damage Plaintiff's Property.

130.    Defendants' willful and wanton conduct directly resulted in the contamination of Plaintiff's Property with Defendants' Fluorosurfactant Products without Plaintiff's permission.

131.    The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOA and/or PFOS continue to enter Plaintiff's Property. The contamination is reasonably abatable.

132.    Plaintiff has not consented to, and does not consent to, this trespass or contamination.

133.    Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

134.    Plaintiff was, is, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto its Property.

135.    Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including Plaintiff. Such conduct was performed to promote the sales of Defendants' Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public welfare.

136.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property, operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

137.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

138.    As commercial manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, and/or as those who assumed or acquired liabilities for the manufacture and sale of Fluorosurfactant Products, Defendants owed a duty of care to Plaintiff not to place into the stream of commerce a defective product that was in a defective condition and unreasonable dangerous to purchasers, end users, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, such as Plaintiff.

139.    Defendants breached their duty by negligently designing, formulating, manufacturing, distributing, selling, supplying and/or marketing such an unreasonably dangerous product into the stream of commerce even when they knew or should have known of the dangers their Fluorosurfactant Products posed to the environment, Plaintiff and Plaintiff's Property.

140.    Despite the fact that Defendants knew that PFOA and PFOS are harmful, can contaminate soil and water resources, and persist in the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and groundwater contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

141.    Plaintiff was a foreseeable victim of the harm caused by Defendants' Fluorosurfactant Products.

142.    Plaintiff was, is, and will continue to be harmed as a result of Defendants' above described acts and omissions.

143.    Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including the contamination of Plaintiff's Property with PFAS.

144.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

145.    Defendants committed each of the above-described acts or omissions willfully and/or deliberately and with a conscious, reckless and outrageous indifference to the welfare of others, including Plaintiff. Such conduct was performed to promote the sales of Defendants' Fluorosurfactant Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and the public welfare.

146.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property. As a result, Plaintiff seeks recovery of any and all past, present and future compensatory and/or consequential damages for the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination of its Property, operating, maintenance and consulting costs, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants as described herein.

## **SEVENTH CAUSE OF ACTION**

### VIOLATION OF THE MISSOURI UNIFORM FRAUDULENT TRANSFERS ACT (AGAINST UFTA DEFENDANTS ONLY)

147.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

148.    Plaintiff seeks equitable and other relief pursuant to the Missouri Uniform Fraudulent Transfers Act, Mo. Rev. Stat. §§ 428.005 *et seq*. ("UFTA"), as adopted by the State of Missouri, against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UFTA Defendants").

149.    Pursuant to Mo. Rev. Stat. § 428.024(1), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

i.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

ii.  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

150.    Subsection 2 of Mo. Rev. Stat. § 428.024 states that, "[i]n determining actual intent under subdivision (1), subsection 1 of this section, consideration may be given, among other factors, to whether: [...] before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; the transfer was of substantially all the debtor's assets; [...] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; [and] the transfer occurred shortly before or shortly after a substantial debt was incurred[.]"

151.    Upon information and belief, in February 2014, Old DuPont formed The Chemours Company as a wholly-owned subsidiary and used it to spin off Old DuPont's "Performance Chemicals" business line in July 2015.

152.    Upon information and belief, at the time of the spinoff, Old DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the

transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS.

153.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

154.    The UFTA Defendants acted with actual intent to hinder, delay and to defraud any creditor of the UFTA Defendants because: (1) they were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

155.    The UFTA Defendants engaged in actions in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiff, and other similar parties, that have been damaged as a result of UFTA Defendants' conduct, omissions, and actions described herein.

156.    As a result of the transfer of assets, obligations, and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacture, design, formulating, marketing, distribution, and/or sale of Fluorosurfactant Products.

157.    Pursuant to Mo. Rev. Stat. §§ 428.005 *et seq*., Plaintiff seeks avoidance of the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

158. Plaintiff further seeks all other rights and remedies that may be available to it under UFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:
    a. costs and expenses related to the past, present, and future investigation, sampling, testing, monitoring, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;
    b. costs and expenses related to the past, present, and future treatment, filtration, and remediation of PFAS contamination of Plaintiff's Property;
    c. costs and expenses associated with and related to the removal and disposal of the PFAS contamination from Plaintiff's Property; and
    d. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.
2. Diminished property value;
3. Consequential damages;
4. Costs, disbursements, and attorneys' fees of this lawsuit;
5. Pre-judgment and post-judgment interest; and
6. Any other and further relief as the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

DATED: May 24, 2023                    Respectfully submitted,

_Scott Summy_

Scott Summy (TX Bar 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal (TX Bar 13569600)
Carla Burke Pickrel (TX Bar 24012490)
Jason Julius (TX Bar No. 24131101)

**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)
Darren Sumich (LA Bar 23321)
David A. Parsiola (LA Bar 21005)
Brandon J. Taylor (LA Bar 27662)
Christina Cossich (LA Bar 32407)
Jody J. Fortunato (LA Bar 31728)
Luana N. Smith (LA Bar 35534)

**ALVENDIA, KELLY & DEMAREST,
LLC**
909 Poydras Street, Suite 1625
New Orleans, LA 70112
Telephone: (504) 200-0000
Roderick Alvendia (LA Bar 25554)

**SPEARS & SPEARS**
909 Poydras Street, Suite 1825
New Orleans, LA 70112
Ike Spears (LA Bar 17811)

***Attorneys for Plaintiff***